[Cite as *State v. Whitaker*, 2024-Ohio-2495.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-23-1142

        Appellee                           Trial Court No.  CR0202202315

v.

Joshua Whitaker                            **DECISION AND JUDGMENT**

        Appellant                           Decided: June 28, 2024

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lorrie J. Rendle, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**ZMUDA, J.**

## I.  Introduction

{¶ 1} Appellant, Joshua Whitaker appeals from a judgment entered by the Lucas County Court of Common Pleas, which, following appellant's no contest convictions for aggravated vehicular homicide and vehicular assault: (1) sentenced appellant to prison; (2) ordered his driver's license suspended; and (3) ordered him to pay restitution to the

victim's family. For the reasons that follow, we affirm the judgment of conviction, but reverse, in part, as to the order of restitution.

## II. Facts and Procedural Background

{¶ 2} On August 4, 2022, appellant was indicted by the Lucas County Grand Jury on one count of aggravated vehicular homicide in violation of R.C. 2903.06(A)(1)(a) and (B), a felony of the second degree (Count 1); one count of aggravated vehicular homicide in violation of R.C. 2903.06(A)(2)(a) and (B), a felony of the third degree (Count 2); one count of vehicular assault in violation of R.C. 2903.08(A)(1)(a) and (B), a felony of the third degree (Count 3); and one count of vehicular assault in violation of R.C. 2903.08(A)(2)(b) and (C), a felony of the fourth degree (Count 4).

{¶ 3} The charges arose from events that occurred on or about May 5, 2022, and resulted in the death of W.G., Jr. and serious injury to D.T.

{¶ 4} At a plea hearing held on April 18, 2023, appellant entered a plea of no contest to Counts 1 and 4. In exchange for his plea, the state agreed to dismiss Counts 2 and 3 at sentencing. The state presented the following statement of facts in support of the charges:

> Had this matter proceeded to trial the State of Ohio would have proven on or about May 5, 2022, the deceased – the victim, [W.G., Jr.], was traveling with his friend, [D.T.], eastbound on Alexis near Roland at the intersection at approximately 5:30 in the afternoon.
>
> They were doing approximately 40 miles an hour when the Defendant, Mr. Joshua Whitaker, who was traveling westbound on Alexis at approximately 70 miles an hour according to the scientific calculations done by the officers at the accident, reconstructionist. [Sic.] He went left of center

2.

causing a major accident, which resulted in [W.G., Jr.'s] loss of life due to the blunt force trauma that he suffered in the accident.

[D.T.] was injured, but thankfully he did not receive life-threatening injuries.

The officers, both the Defendant and the – [W.G., Jr.] were extracted from the vehicles, taken to the hospital.

Investigators sought a search warrant for a blood draw that returned a blood alcohol level of the Defendant to be .27 BAC.

\* \* \*

The urine draw was also done, which obviously we don't know about the timing of that because it's in the urine, but there was 123 nanograms per milliliter of marijuana in his urine system.

Throughout the pendency of this case Mr. Whitaker also made several jail calls to his friends, family members, indicating his guilt and acknowledgement that he was under the influence when he caused this horrific accident \* \* \*.

{¶ 5} The trial court asked defense counsel whether he had any objection to this statement, and defense counsel answered that he did not. The court accepted appellant's plea of no contest and ordered a presentence investigation report.

{¶ 6} The presentence investigation report detailed appellant's prior history and a description of the facts underlying the current offense. The report also contained victim impact statements from victim D.T. and from victim W.G., Jr.'s father, W.G., Sr.

{¶ 7} W.G., Sr., reported that his son's medical bills totaled $63,000, of which car insurance paid $5,000 and health insurance paid the remaining $58,000. He further reported that "the health insurance has filed suit to be reimbursed the $58,000 from the

3.

estate of [W.G., Jr.]," and that he "is currently trying to fight it with an attorney and litigation is pending."

{¶ 8} At a sentencing hearing held on May 15, 2023, the trial court heard from appellant and his counsel in mitigation. Addressing the court directly, appellant spoke in detail about his struggles with mental health issues and alcohol addiction. Next, he described the events leading up to the automobile collision. He began by acknowledging his decision to drink at work on the date in question. He explained that he tried to sober up for four days, and the withdrawal symptoms made him feel "miserable." On the fifth day he had to go to work and decided to "chug" a White Claw "real quick" on the way to work, because he was sweating and shaking and wanted to "make the shakes go away."

{¶ 9} Approximately 45 minutes to an hour after he arrived at work, he started feeling "irritation" and compared this feeling to having "battery acid in [his] veins." He explained that he went to his car to take a break and "get [his] bearings straight." That is when he spotted a bottle of vodka in the backseat of his car. He decided he was "just going to drink it." He said he went back inside the store where he worked, got a half-full slushy, filled the other half with vodka, and then began drinking it while he was at work.

{¶ 10} Appellant said that when he struggled to assist a customer, his co-worker recognized that he had been drinking and suggested that he go home. Appellant said he did not argue, because he did not want to get in any more trouble.

{¶ 11} Appellant next described his first memories following the collision:

* * * I woke up in the hospital, and I couldn't move for a little bit, but I – I came back around. I quickly found out that unfortunately I made it through,

4.

but someone else didn't. I thought maybe I hit a telephone pole. I was hoping I got lucky. And then I found out someone had passed away through my mom when I woke up.

First, I just wanted to die. I really didn't want to – you know – I didn't want to – I already had enough problems and now I took someone else's life, and I felt like I really wish it would have just been me, because I was going through problems.

This person wasn't and I done took their life now, and can't take that back.

{¶ 12} Appellant ended his comments by expressing a desire to speak publicly on the perils of drinking and driving, and to "stay out of the way as much as possible."

{¶ 13} Victim D.T. was next to address the court. He described the physical and emotional toll that the events of May 5th had taken on him. He stated that the collision had cost him his friend, his independence, and his career. He also stated that, following two surgeries on his right foot and months of physical therapy, he continues to suffer from mobility issues.

{¶ 14} The court also heard from W.G., Sr. An R.N. with experience treating trauma victims, W.G., Sr. explained in graphic detail the pain his son was likely to have experienced from the moment of impact until he took his last breath. After describing the kind of man his son was and the impact of his loss on his entire family, W.G., Sr. noted appellant's apparent lack of remorse.

{¶ 15} After hearing from all the witnesses, the court noted that it had considered the record, oral statements, victim statements, letters written by and on behalf of appellant, the presentence investigation report, and the principles and purposes of sentencing under R.C. 2929.11. The trial court also noted that it had balanced the

5.

seriousness and recidivism factors under R.C. 2929.12. Thereafter, the court sentenced appellant to serve an indefinite prison term of a minimum of 7 years (with a maximum term of 10 ½ years) as to Count 1, aggravated vehicular homicide, and a prison term of 17 months as to Count 4, vehicular assault, with the sentences ordered to be served consecutively.

{¶ 16} The court also suspended appellant's driver's license for a period of 20 years as to Count 1, and ten years as to Count 4.

{¶ 17} Finally, the court ordered appellant to pay restitution to his victims, stating:

I have an amount of restitution that is articulated in the pre-sentence investigation and report for [W.G., Jr.'s] family. I was showing an amount of $11,500.00 was shown for the funeral expenses, and then also there was an amount for medical expenses, that his medical bills were $63,000.00 at least as it relates to this report.

{¶ 18} When asked for clarification regarding W.G., Jr.'s medical expenses, the court explained:

I will go back to that page [of the presentence report]. The page – this reads there was 63 total medical bills. The car insurance paid 5,000, which left a remaining balance of 58,000, which was covered by health insurance.

*However, the health insurance company is fighting for a reimbursement of the $58,000 from the estate of [W.G., Jr.].* Is that accurate?

All right. So the restitution order for [W.G., Jr.] is consistent with that. The funeral I also have as $11,500. They used the proceeds from an insurance policy – life insurance policy to pay for the funeral services.

So that leaves the funeral services still as being paid for, $11,500.00. *The disputed medical bills, which the family is going to be responsible for unless otherwise resolved, $58,000.* So those will be the two combined for [W.G., Jr.'s] family, which would be $69,500.

6.

(Emphasis added.)

{¶ 19} The court also ordered appellant to pay restitution to D.T., stating, "As far as the medical bills for [D.T.], $122,648.16, and his lost ability to work and damages there, $27, 424.00, total, $150,072.96."

{¶ 20} The June 30, 2023 judgment entry memorializing appellant's sentence similarly states: "Defendant ordered to pay restitution in the amount of $69,500.00 to [W.G., Jr.'s] Family and $150,072.96 to the victim [D.T.].

{¶ 21} Appellant now appeals his conviction and sentence.

### III.  Assignments of Error

{¶ 22} Appellants asserts the following assignments of error on appeal:

I.      Appellant's conviction pursuant to R.C. 2903.06(A)(1)(a) is not authorized by law.

II.     The order of restitution is not authorized by law.

### IV.  Analysis

**A. The state did not need to separately charge appellant for violation of R.C. 4511.19, as aggravated vehicular homicide required only proof of the violation, and not a separate conviction for violation of R.C. 4511.19.**

{¶ 23} In his first assignment of error, appellant argues that his conviction for aggravated vehicular homicide, a violation of R.C. 2903.06 (A)(1)(a) and (B), is not authorized by law.

7.

{¶ 24} R.C. 2903.06(A)(1)(a) provides in pertinent part:

(A) No person, while operating or participating in the operation of a motor vehicle * * *, shall cause the death of another * * * in any of the following ways:
(1)(a) *As the proximate result of committing a violation of division (A) of section 4511.19 of the Revised Code* or of a substantially equivalent municipal ordinance.

(Emphasis added.)

R.C. 4511.19(A) provides:

(A)(1) No person shall operate any vehicle * * * if, at the time of the operation, any of the following apply:
(a) The person is under the influence of alcohol, a drug of abuse, or a combination of them.
* * *
(f) The person has a concentration of seventeen-hundredths of one per cent or more by weight per unit volume of alcohol in the person's whole blood.
* * *
(j) Except as provided in division (K) of this section, the person has a concentration of any of the following controlled substances or metabolites of a controlled substance in the person's whole blood, blood serum or plasma, or urine that equals or exceeds any of the following:
* * *
(vii) The person has a concentration of marijuana in the person's urine of at least ten nanograms of marihuana per milliliter of the person's urine * * *.

{¶ 25} In this case, there is no question that appellant caused W.G., Jr.'s death as a proximate result of violating R.C. 4511.19(A)(1)(a), (f), and (j)(vii). His blood test returned a .27 BAC, which proves that he violated R.C. 4511.19(A)(1)(a) and (f). And his urine test, which revealed 123 nanograms of marihuana per milliliter, establishes that he also violated R.C. 4511.19(A)(1)(j)(vii). Far from disputing any of this evidence, appellant admitted at sentencing to having caused the collision while under the influence of alcohol.

8.

{¶ 26} According to appellant, however, for his aggravated vehicular homicide conviction to be lawful, the trial court must also have convicted him for operating a vehicle while intoxicated under R.C. 4511.19(A).

{¶ 27} A review of the plain language of R.C. 2903.06(A)(1)(a) reveals that a conviction for aggravated vehicular homicide requires only that the defendant must have caused the death of another as a proximate result of "*committing a violation of*" R.C. 4511.19(A). Thus, the state must establish the *elements* of an offense under R.C. 4511.19(A) to get a conviction under R.C. 2903.06(A)(1)(a). But there is no requirement that there be an additional conviction under the subsumed DUI statute. In this case, the record is clear that the state established each element under both statutes.

{¶ 28} Appellant's first assignment of error is, therefore, found not well-taken.

**B. Restitution could not be awarded to the family of the victim pursuant to R.C. 2929.18(A)(1) and the record of the case.**

{¶ 29} Appellant argues in his second assignment of error that the trial court improperly ordered him to pay restitution. The trial court ordered appellant to pay restitution in the amount of $150,072.96 to the victim D.T. The trial court further ordered appellant to pay restitution in the amount of $69,500 to the family of W.G., Jr. On appeal, appellant challenges only the inclusion in the restitution order of $58,000 for medical expenses, payable to the family of W.G., Jr. According to appellant, this amount "arguably" represents an improper payment to "the (unnamed) 'health insurance company,' which had already paid some of the medical bills."

9.

**{¶ 30}** "'[T]he proper standard of review for analyzing the imposition of restitution as a part of a felony sentence is whether the sentence complies with R.C. 2953.08(G)(2)(b).'" *State v. Young*, 2020-Ohio-4943, ¶ 11 (6th Dist.), quoting *State v. Collins*, 2015-Ohio-3710, ¶ 31 (12th Dist.). Therefore, we must determine whether the restitution imposed was "contrary to law." *Id.*, citing *State v. Cantrill*, 2020-Ohio-1235, ¶ 87 (6th Dist.) (additional citation omitted.).

**{¶ 31}** Where, as here, a defendant did not object to the award of restitution in the trial court, we apply a plain error standard. *State v. Allen,* 2021-Ohio-4398 (6th Dist.), ¶ 16, citing *State v. Queen,* 2020-Ohio-618, ¶ 6 (3d Dist.); *see also State v. Leveck*, 2021-Ohio-1547, ¶ 13, citing *State v. Griffin,* 2013-Ohio-411, ¶ 43 (6th Dist.) "Plain error is error affecting substantial rights and is reserved for the exceptional case where reversal of the trial court's judgment is necessary to prevent a manifest miscarriage of justice." *Leveck* at ¶ 13, citing *State v. Tucker,* 2012-Ohio-622, ¶ 6 (6th Dist.); *see also* Crim.R. 52(B).

**{¶ 32}** R.C. 2929.18(A)(1) provides that a trial court may order a felony offender to pay restitution to the victim or, where applicable, to the victim's estate "in an amount based on the victim's economic loss." The statute additionally provides that "[t]he amount the court orders as restitution shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense." R.C. 2929.18(A)(1).

10.

{¶ 33} R.C. 2929.18(A)(1) also provides a list of permissible restitution payees, including (1) the victim; (2) the adult probation department that serves the county on behalf of the victim; (3) the clerk of courts; or (4) another agency designated by the court.

{¶ 34} In challenging the restitution order in this case, appellant alleges that the trial court "arguably" ordered restitution to be paid to an impermissible third party, namely W.G., Jr.'s insurance company. Although W.G., Sr. did "specifically request that [appellant] make restitution to the health insurance [company]," the court did not issue an order to this effect. Instead, the court -- after acknowledging that "the health insurance company is fighting for a reimbursement of the $58,000 [in paid medical bills] from the estate of [W.G., Jr.]," and that "the family is going to be responsible for [$58,000] unless otherwise resolved" -- ordered appellant to pay "restitution in the amount of $69,500.00 [representing a combined award for W.G., Jr.'s medical bills and funeral costs] to the [W.G., Jr.] Family."

{¶ 35} Appellant argues that there was no indication that the health insurance company had paid expenses for which it was not legally responsible under the terms of W.G., Jr.'s policy. In fact, the record contains no details regarding the insurance policy terms or the insurance company's claim for reimbursement, with only W.G., Sr.'s claim that the insurer was "fighting for reimbursement" from W.G., Jr.'s *estate*. Despite this claim by W.G., Sr., the trial court concluded that "***the family***" of W.G., Jr. would have to reimburse the insurance company. The record is devoid of facts that would support this conclusion regarding the family's liability under the terms of W.G., Jr.'s insurance

11.

policy. Therefore, the trial court awarded restitution in favor of "the family" for medical expenses that insurance covered but "the estate" might have to reimburse, with the insurer the ultimate, intended recipient of the restitution.

{¶ 36} Pursuant to R.C. 2929.18(A)(1), restitution "shall not exceed the amount of economic loss suffered by the victim" and courts must consider any offsets against restitution, such as amounts awarded for "economic loss in a civil action brought by the victim or the victim's estate against the offender." While the award of restitution was not designated as payable to the insurance company, as requested by W.G., Sr., the trial court's stated intent was clearly to pass the award for medical expenses, already paid, through the family to resolve an unidentified "lawsuit" between the insurer and its insured. The record clearly demonstrated no out-of-pocket expenses to the family related to the medical bills, with W.G., Sr., instead, indicating W.G., Jr.'s medical insurance paid $58,000 in medical expenses. Additionally, restitution is awarded to a victim, and "insurance companies may not receive restitution for economic losses after they reimburse a customer for a loss covered by an insurance policy." *State v. Allen,* 2019-Ohio-4757, ¶ 11, citing *State v. Aguirre,* 2014-Ohio-4603, ¶ 1.

{¶ 37} Restitution must also be compensation for a victim's economic losses suffered "as a direct and proximate result of the commission of the offense[.]" *State v. Yerkey,* 2022-Ohio-4298, ¶ 15, citing R.C. 2929.18(A)(1); 2929.28(A)(1); 2929.01(L). "Generally speaking, a consequence is a direct and proximate result of an act when the consequence is foreseeable and is produced by the natural and continuous sequence of

12.

events following the act." *Yerkey* at ¶ 16, citing *Strother v. Hutchinson,* 67 Ohio St.2d 282, 286-287 (1981). Thus, the victim's out-of-pocket medical expenses or lost wages to treat injury caused by commission of the offense are consequences that flow from the offense. R.C. 2929.01(L). Other losses, such as costs incurred by the victim to assist the prosecution by investigating or taking time off work to attend court hearings are consequential costs, subsequent to the commission of the offense and not a direct and proximate result that foreseeably flowed from the commission of the offense. *Yerkey* at ¶ 16-17.

{¶ **38**} Simply put, restitution does not cover all costs incurred by the victim. As the Ohio Supreme Court recently noted, relative to the limits of restitution:

> No one on this court thinks that victims should not be made whole. But to what extent court-ordered restitution as part of a criminal case may be used to make a victim whole is a matter determined by statute and the Constitution, as explained above. Moreover, it is important to recall that restitution through the criminal-justice system is not the only recourse for crime victims. A crime victim has the same access to the civil-justice system as anyone who has been the victim of a tort and, moreover, may seek recovery for his or her losses from the crime-victims' compensation funds administered by the Ohio Attorney General and the Court of Claims, which is helpful in cases in which the perpetrator is judgment-proof. There is also a countervailing policy consideration—if restitution were to be expanded to include economic detriments that were not "direct and proximate result[s] of the commission of the offense," R.C. 2929.28(A)(1); R.C. 2929.18(A)(1), we would risk mutating sentencing hearings throughout the state into civil trials of all grievances the victim may have against the offender, regardless of their relation to the crimes at issue. For the sake of prompt criminal-justice proceedings across the state, that is a pitfall to avoid.

*Yerkey* at ¶ 18.

13.

{¶ 39} The evidence in the record in this case demonstrates the trial court's award of $58,000 to "the family" was intended to reimburse the insurance company for medical bills, already paid, resulting from a claimed dispute between the insurer and its insured. The trial court also ordered appellant to pay restitution to "the family," despite the dispute over reimbursement between the insurer and the insured's estate. Furthermore, as a practical matter, treating reimbursement expenses that remain in dispute as restitution expenses could result in an order to pay restitution without any actual economic loss, should the estate prevail in the unspecified lawsuit with the insurer. Finally, as reimbursement expenses are dependent on resolving the dispute between the insurer and the insured's estate, these expenses cannot be characterized as directly and proximately caused by the commission of the offense. As a result, this restitution does not fall within the parameters set forth at R.C. 2929.18(A)(1), which permit recovery of "economic loss suffered by the victim as a direct and proximate result of the commission of the offense." The restitution order relative to the medical expenses, accordingly, is contrary to law.

{¶ 40} As the restitution order is contrary to law, we must next consider whether the trial court's error rises to the level of plain error. As previously addressed, plain error is error or defect "affecting substantial rights" and is invoked "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Woodard,* 2018-Ohio-2402, ¶ 47 (6th Dist.), citing *State v. Landrum,* 53 Ohio St.3d 107, 111 (1990), quoting *State v. Long,* 53 Ohio St.2d 91 (178), paragraph three of the syllabus.

14.

**{¶ 41}** The order of restitution, in this case, was not supported with evidence of expenses that directly and proximately arose from the commission of the offense, and no evidence that "the family" incurred those expenses. There must be competent, credible evidence to support the trial court's determination regarding the amount of restitution. *State v. Caldwell,* 2018-Ohio-2593, ¶ 25 (6th Dist.).

**{¶ 42}** We have previously determined that restitution awarded without supporting evidence constitutes plain error. *See, e.g., State v. Peck,* 2013-Ohio-4835, ¶ 21 (6th Dist.) (where no evidence of the victim's lost wages was proffered, to demonstrate an amount of loss, award of restitution constituted plain error).

**{¶ 43}** We have also found that restitution awarded without authority, for a third party's economic loss, is reversible as plain error. *See, e.g., State v. Wagner,* 2015-Ohio-5502, ¶ 97 (trial court had no authority under R.C. 2929.18(A)(1) to order payment of the counseling expenses for the victim's mother or for lost wages for the victim's parents, and including these as restitution was plain error); *see also State v. Williams,* 2013-Ohio-4838, ¶ 8-11 (restitution to a police agency to reimburse funds to pursue a drug buy through an informant was plain error, as an award to a non-victim, third party).

**{¶ 44}** Finally, we have reversed an award of restitution to an insurance company, as plain error. *See e.g., State v. Seele,* 2014-Ohio-1455, ¶ 9 (6th Dist.) (finding restitution to the insurance company, a third party, was improper).

**{¶ 45}** The award of restitution in the amount of $58,000, ostensibly for medical expenses, lacks evidentiary support in the record because the only evidence concerning

the medical bills demonstrated payment by insurance. The restitution, moreover, was awarded for the *potential* economic loss of "the family" based on a dispute between the insurer and the insured's estate, a matter that was separate from and not a foreseeable consequence of appellant's offense. Finally, the record clearly demonstrated that restitution was intended to benefit the victim's insurance company, but only if the claimed dispute resolved in the insurer's favor, with no evidence to demonstrate the family had any obligation to the insurer, relative to the dispute.

{¶ 46} "A reviewing court should notice plain error only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *State v. Ahlers*, 2015-Ohio-131, ¶ 15 (6th Dist.), citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). However, an improper restitution award, without authority or supporting evidence, "alters the outcome of the proceedings, thus constituting plain error." *State v. Alcala,* 2012-Ohio-4318, ¶ 30, citing *State v. Marbury,* 104 Ohio App.3d 179, 181 (8th Dist. 1995). Because the trial court lacked authority or supporting evidence to award restitution to the family to cover the expense of reimbursement to the insurance company, the award of $58,000 to the family of W.G., Jr. as restitution constituted plain error.

{¶ 47} Appellant's second assignment of error relative to the $58,000 ordered in restitution, accordingly, is found well-taken.

### V. Conclusion

{¶ 48} For all of the foregoing reasons, the judgment of the Lucas County Court of Common Pleas is reversed, in part, as to the award of restitution to the family of W.G., Jr.

16.

in the amount of $58,000, and the award of restitution in the amount of $58,000 is vacated. We affirm the judgment in all other respects. The parties are ordered to split the costs of this appeal pursuant to App.R. 24.

Judgment affirmed, in part, reversed, in part, and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.
_____
                      JUDGE
Charles E. Sulek, P.J.
CONCUR
_____
                      JUDGE

Myron C. Duhart, J.
_____
CONCURS, IN PART,                 JUDGE
DISSENTS, IN PART,
AND WRITES SEPARATELY

**DUHART, J., concurring in part and dissenting in part.**

{¶ 49} While I concur in the majority's decision affirming appellant's conviction, as I would not reverse the $58,000 award of restitution for medical bills in this case, I must respectfully dissent in part.

{¶ 50} First, unlike the majority, I believe the award falls squarely within the parameters set forth at R.C. 2929.18(A)(1), which permit recovery of "economic loss

suffered by the victim [or the victim's estate] as a direct and proximate result of the commission of the offense," inasmuch as the trial court properly assessed the cost of W.G, Jr's medical bills to appellant for causing the collision that took W.G., Jr.'s life. That liability for these expenses remains a matter of dispute between the estate and the insurance company does not render the expenses themselves any less the direct and proximate result of the commission of the offense.

{¶ 51} Next, there is no question that evidence of the ongoing litigation between the health insurance company and the estate of W.G., Jr. raised the possibility that the $58,000 payment to the estate might one day be returned to the insurance company, leaving the estate -- and by extension, the victim's family -- in a substantially worsened financial condition. I believe that the trial court, in construing the impact of the insurance company's claim in a light that benefits the victim's family -- as opposed to one benefiting appellant – acted reasonably in a difficult and uncertain situation, and did not commit plain error.

{¶ 52} The majority states that "[w]hile the award of restitution was not designated as payable to the insurance company … the trial court's stated intent was clearly to pass the award for medical expenses … through the family to resolve an unidentified 'lawsuit' between the insurer and its insured." This interpretation of the trial court's actions unfairly forces the conclusion that the trial court purposely – and unlawfully – ordered restitution to be paid to an impermissible third party, namely W.G., Jr.'s insurance company.

18.

{¶ 53} Because I believe that the $58,000 restitution award for medical expenses was properly imposed, I would affirm the judgment of the trial court in its entirety.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.